BELLE ISLE CAB CO., INC. *v.* CLARENCE PRUITT

[No. 9, October Term, 1946.]

*Decided October 30, 1946.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Benjamin C. Howard* and *Harrison L. Winter*, with whom were *Miles, Welsh, O'Brien & Morris* on the brief, for the appellant.

*David J. Markoff* and *Harold Bachman* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

The appeal in this case involves a question of liability for personal injuries caused by a collision of motor vehicles in Baltimore City at a stop intersection. The facts may be stated briefly. On October 26, 1944, the appellee was a passenger for hire, or "rider," in a station wagon owned and operated by Victor Blue, his co-employee at the Bethlehem Fairfield Shipyard. Blue was proceeding north on Pulaski Street in clear dry weather, at about 4 o'clock in the afternoon, at a speed of from 20 to 25 miles per hour, according to Pruitt, or 5 to 10 miles per hour, according to Blue. As Blue approached the intersection of Pulaski and Baker Streets he slowed down but did not stop, although he saw a vehicle approaching on his right at a distance of about half a block, or at any rate not "at a distance enough to call it on top of you." Blue did not testify as to the speed of the approaching vehicle; Pruitt did not see it at all, prior to the impact. Both witnesses admitted that Blue did not stop at the intersection. On the contrary he changed into high gear and proceeded without looking again.

Albert C. Hundertmark, a taxi driver, was proceeding west on Baker Street at a speed of from 20 to 25 miles per hour, about five feet from the righthand curb. He testified that both streets were rather narrow, about 20 feet wide, and that there were no vehicles ahead of him. He testified that he looked to his right, then back to his left, when he saw the station wagon right in front of him, about 18 inches away. At that time he had slowed down to 20 miles per hour. He tried to stop and to avoid collision by turning to his right, but his left fender struck the station wagon about in the middle on its right side. He testified that if he had turned to

his left the collision would have been head on. The station wagon continued on up Pulaski Street for a distance of two or three houses from the corner before it came to rest; the taxicab remained in the intersection.

It was agreed by counsel for the respective parties that at the time of the accident there were signs on Pulaski Street, both north and south of Baker Street, reading "Stop Intersection," while on Baker Street, both east and west of Pulaski Street, there were signs reading "Slow, Dangerous Corner." All of these signs had been erected by the Police Department of Baltimore City. It was also agreed that there was no police officer directing traffic, and no traffic control signal in operation, at the intersection.

At the conclusion of the testimony the appellant offered a demurrer prayer, which was refused. The jury found a verdict of $1,000 against both defendants, Victor Blue and the Cab Company. The latter filed a motion for judgment *n. o. v.*, which was refused. The Cab Company appealed to this Court, Blue did not appeal. The appellant contends that there was no legally sufficient evidence of negligence on the part of its driver, and that in any event the sole and proximate cause of the accident was the failure of the driver of the station wagon to yield the right of way.

There can be no doubt that the erection of the stop sign made Baker Street a stop intersection, with all the attributes of a through highway, although the terms are not identical. Section 178 of Article 66½ of the Maryland Code, as codified in Chapter 1007 of the Acts of 1943, provides:

"(Vehicle Entering Through Highway or Stop Intersection.) (a) The driver of a vehicle shall come to a full stop as required by this Article at the entrance to a through highway and shall yield the right of way to other vehicles approaching on said through highway.

"(b) The driver of a vehicle shall likewise come to a full stop in obedience to a stop sign and yield the right of way to a vehicle approaching on the intersecting high-

way as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway."

Section 187 (a) of Article 66½ provides: "The State Roads Commission with reference to State and county highways, and local authorities with reference to other highways under their jurisdiction may designate through highways and erect stop signs at specified entrances thereto or may designate any intersection as a stop intersection and erect like signs at one or more entrances to such intersection."

Section 187 (c) provides: "Every driver of a vehicle shall come to a full stop at such sign or at a clearly marked stop line before entering an intersection and yield the right of way to vehicles approaching on the intersecting highway except when directed to proceed by a peace officer or traffic control signal." Section 2 (44) defines "Right of Way" as "the privilege of the immediate use of the highway." These provisions with reference to stop intersections were incorporated in the general law after the decision of this Court in the case of *McClenny v. Przyborowski*, 182 Md. 95, 32 A. 2d 365.

The underlying purpose of the statute was clearly expressed by this Court in *Greenfeld v. Hook*, 177 Md. 116, 125, 8 A. 2d 888, 892.

"That statute imposes upon one driving an automobile along or on a highway intersecting such a stop street, arterial highway or boulevard the duty of coming to a complete stop before entering the favored highway and of yielding the right of way to all vehicles traveling thereon.

The two duties, of stopping and of yielding the right of way, are correlated and coordinate. That of stopping is to give force and practicability to that of yielding the right of way, by requiring the inhibited traveller before entering the intersection to stop in order that he may ascertain whether traffic is approaching over and along the favored highway. The rule could have no other rational purpose, for unless the inhibited traveller yields

the right of way to traffic on the stop street, the mere act of stopping would be idle, useless and futile. The obvious and essential purpose of such rules is to accelerate the flow of traffic over through highways by permitting travellers thereon to proceed within lawful speed limits without interruption. That purpose would be completely frustrated if such travellers were required to slow down at every intersecting highway, and the vast sums which have been spent in their construction in an effort to accommodate the great volume of automobile traffic which is so indispensable a part of modern life, would be largely wasted. On the other hand the safety of the travelling public demands that the rules defining the relative rights of travellers on through highways and on highways intersecting them be clear, unmistakable and definite. If the duty of stopping and of yielding right of way, is positive and inflexible, the inhibited traveller may know that he violates it at his risk, while the traveller on the favored highway may know that he may safely exercise the privilege of uninterrupted travel thereon which the statute gives. If, however, the relative rights of travellers on the two types of highway are held to depend upon nice calculations of speed, time and distance the rule would encourage recklessness and the privilege of uninterrupted travel would mean little more than the privilege of having a jury guess in the event of a collision whose guess was wrong. If the traveller on a stop street were required to slow down and bring his car into control at every intersection there would be no perceptible difference between such a street and any other street on which traffic is controlled by the general Rules of the Road."

In the Greenfeld case, however, the court found evidence to permit the case to go to the jury on the theory of last clear chance. And in other passages in that opinion the court recognized that the driver on the favored highway does not have an absolute right to proceed under all circumstances. See also the comment on this case in 4 Md. L. R. 207, 213. The recitals in Sec-

tion 1 of Article 66½ of the Code, as codified, would seem to negative any implication that the statute was designed to change the established law of negligence so as to relieve the favored driver of all duty to use care. But in determining due care, the assumption that the unfavored driver will stop and yield the right of way is an important factor. .

In the later case of *Rinehart v. Risling*, 180 Md. 668, 26 A. 2d 411, 414, the plaintiff was a passenger in a car which entered a favored highway from an unfavored highway, and was injured in a collision with a truck proceeding on the favored highway at a speed of 20 miles per hour. The truck driver testified that he did not see the car until it was too late to avoid collision. In holding that the truck owner's demurrer prayer should have been granted, this Court said: "There is no evidence that this truck driver was not observing the road ahead of him. It is admitted that he was on the right side of the road. There is no doubt that the lights were lighted on the truck. * * * There is no evidence of any excessive speed on the part of the truck driver. * * * The driver of the truck being the favored driver had the right to assume that the unfavored car entering the boulevard would respect the provisions of the statute."

In the case at bar there was no evidence of excessive speed, and no evidence that the taxicab was on the wrong side of the road. There was evidence that the taxi driver did not see the station wagon until it had entered the intersection, but in the absence of any evidence to support the theory of a last clear chance, we cannot find any causal connection between his failure to see the other vehicle and the collision. Had he seen the other vehicle approaching, the taxi driver could properly have assumed that the station wagon would stop before entering the intersection and would yield the right of way in any event up to the very moment of impact.

It is earnestly contended, however, that the relative rights and duties of the two drivers were modified by the fact that the Police Department had erected a sign upon

the favored highway reading, "Slow, Dangerous Corner." It is argued that this sign imposed a special or extraordinary duty of care upon the driver using the favored highway. We do not agree with this contention.

In the first place, we find nothing in Article 66½ of the Code to indicate that state or local agencies have the power to modify the stautory effect of a stop intersection sign. Section 135 of Article 66½, dealing with the powers of local authorities, carefully limits their authority to the following matters: (1) parking, (2) "regulating traffic by means of peace officers or traffic control devices," (3) processions, (4) one-way highways, (5) speed and weight in parks, and (6) "designating any intersection as a stop intersection requiring all vehicles to stop at one or more entrances to such intersections." The traffic control devices referred to in (2) are required by Section 139 to conform to the State Manual and Specifications. Detailed specifications are set out in Sections 141 and 142. Section 1 of Article 66½ provides that the provisions of the Article are intended to be state-wide in their effect "and except to the extent that they may be specifically authorized by other provisions of this Article, no City, County, or other Municipal subdivision of the State shall have the right to make or enforce any local law, ordinance or regulation upon any subject for which provision is made in this Article." We do not mean to imply any lack of authority to erect warning or cautionary signs in the interest of safety, nor do we suggest that the slow sign did not conform to standards of uniformity, but we think such signs cannot have the effect of limiting the privilege of uninterrupted travel on a favored highway which the statute confers.

In the second place, we think it far from clear that the sign was intended to have the effect contended for, or that the taxi driver violated its injunction. The warning that the corner was "dangerous" may have had reference to a variety of conditions, such as the volume of pedestrian or other traffic, or physical conditions tending to obscure vision or prevent quick stops or turns. We

cannot assume that the local authorities erecting the "slow" sign meant to put the user of the favored highway on notice not to rely upon his right of way at that point, whatever cautionary effect might be given to the sign in other respects. And the taxi driver, according to the undisputed evidence, was literally going "slow." His speed was within the maximum allowance, even for a thickly settled district, and his speed at the intersection was further reduced. From the position of the vehicles after the collision we may infer that the station wagon had by far the greater momentum.

But even if we should assume unreasonable or excessive speed on the part of the taxi driver under the circumstances, we are unable to find that such speed contributed to, or was the proximate cause of, the accident. In *Monumental Motor Tours v. Becker,* 165 Md. 32, 166 A. 434, the plaintiff was injured while a passenger on a bus proceeding on a favored highway at an unlawful rate of speed, which struck a vehicle entering from an unfavored highway. It was held that the speed of the bus was not shown to be the proximate cause of the accident. In the earlier case of *Sun Cab Co. v. Faulkner,* 163 Md. 477, 163 A. 194, the collision occurred when a "Sun" cab crossing on a green light was struck by a "Yellow" cab crossing against a red light. A passenger in the "Sun" cab sued both companies, and it was shown that the "Sun" cab was going at an excessive rate of speed. This Court said (163 Md. at page 479, 163 A. at page 195) : "But taking it as proved that there was negligence in the rate of speed in this instance, that negligence, in the approach, must be found to have been the cause of the collision, or there can be no legal responsibility for it on the Sun Company's part. The principal cause was, obviously, the unexpected coming through of the Yellow cab, in violation of the right of way. Its doing so was not a consequence of any speed maintained by the Sun cab. Whatever other consequences the speed might have threatened, it could not be said that it threatened to cause a collision with a cab so coming through.

On the contrary, the situation created by it, if left to itself, with all its natural consequences, would have been a safe one; and it was only by the intervention of the independent agency that the collision resulted, an independent agency not set in motion or at all influenced by the driving of the Sun cab. That being true, the assumed negligence of the driver of that cab could not be treated as a proximate, legal cause of the accident and injury."

To the same effect see *Blinder v. Monaghan*, 171 Md. 77, 188 A. 31, and *Madge v. Fabrizio*, 179 Md. 517, 20 A. 2d 172. These cases illustrate the principle that while questions of proximate cause, like questions of negligence or contributory negligence, are ordinarily decided as questions of fact, they may be so clear as to be determinable as questions of law. Compare *Shedlock v. Marshall*, 186 Md. 218, 46 A. 2d 349. See also *Reeves v. Staley*, 1942, 220 N. C. 573, 18 S. E. 2d 239.

In the case at bar we find no legally sufficient evidence to charge the appellant with liability for the collision, and we therefor hold that the motion for judgment *n. o. v.* should have been granted.

*Judgment reversed and entered n. o. v. for the appellant, with costs.*

MARKELL, J., filed the following dissenting opinion:

At a stop intersection[1] a taxicab on the favored highway collided with a station wagon coming from the left on the intersecting highway. At the entrance to the favored highway was a sign "Stop Intersection"; on the favored highway was a sign "Slow, Dangerous Corner." The taxi driver did not look to the left until too late to avoid the collision. The jury found both drivers negligent. The question is whether there is any legally sufficient evidence of negligence of the taxi driver. The majority opinion holds there is none.

---

[1] The difference between a stop intersection and a through highway, in this case at least, is verbal only and not material. Art. 66½, Secs. 2 (59), 135 (a) (6), 187 (a).

Negligence is failure to exercise that care which a reasonably prudent man would exercise in the circumstances. Relevant circumstances may include statutes, other regulations, special dangers and warnings. For the reasons stated in this Court's opinion, the driver of the station wagon clearly was negligent. For the same reasons and on the authorities cited, the taxi driver would be free from negligence in the absence of the special warning sign, *i. e.,* if the intersection were an unqualified stop intersection. On the other hand, if the intersection were not a stop intersection at all, the taxi driver's failure to look to the left would be evidence of negligence, even though he had the right of way over a vehicle coming from the left. *Askin v. Long,* 176 Md. 545, 547, 548, 550, 551, 6 A. 2d 246. "The driver of the taxicab was of course under the duty to recognize that drivers from the left will often cross negligently, miscalculating the chances of collision." *Clautice v. Murphy,* 180 Md. 558, 563, 26 A. 2d 406, 408.

The majority opinion disclaims "any lack of authority to erect warning or cautionary signs in the interest of safety," but holds that "such signs cannot have the effect of limiting the privilege of uninterrupted travel on a favored highway which the Statute confers."

This view, I think, begs the question and misconstrues the statute. The fact that the sign "Slow, Dangerous Corner," if heeded would have the necessary effect of "limiting uninterrupted travel on the favored highway" shows that the highway bearing this warning sign was not an unqualified stop intersection such as is described in the decisions of this Court. The statute does not "confer any privilege of uninterrupted travel." It does not require the local authorities to establish any "stop intersections" at all. It does not justify anybody, in the face of such warning, in passing a "dangerous corner" without looking. From the signs on both highways it is evident that the local authorities did not regard this corner as a safe place for "uninterrupted travel," but as requiring special care on both highways.

They did not intend to establish there an unqualified stop intersection. I do not think the statute gives a sinister magic to the words "stop intersection," regardless of how the word may be qualified by other warnings.

Safety is the paramount object of all traffic regulation. I see nothing in the statute which forbids dual warnings or authorizes disregard of such warnings.

I think the judgment should be affirmed.

Judge DELAPLAINE authorizes me to say that he concurs in this opinion.